AO 91 (Rev. 11/82)                              **CRIMINAL COMPLAINT**

FILED
CLERK, U.S. DISTRICT COURT

AUG 16 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ANATOLE MBE | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br>18MJ02132 |

Complaint for violation of Title 18, United States Code, Section 1028(a)(3)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE MICHAEL R. WILNER | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>June 22, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1028(a)(3)]

On or about June 22, 2018, in Los Angeles County, within the Central District of California, defendant ANATOLE MBE did knowingly possess with intent to use unlawfully or transfer unlawfully five or more identification documents not issued lawfully for the use of the defendant, to wit, eight Social Security cards containing the names and Social Security numbers of individuals who were not defendant, which were or appeared to have been issued by or under the authority of the United States, in violation of Title 18, United States Code, Section 1028(a)(3).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**ALFREDO ROSSI** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, United States Secret Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**MICHAEL R WILNER** | DATE<br>August 16, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Catherine Ahn ext. 2424     REC: Detention

**AFFIDAVIT**

I, Alfredo Rossi, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Anatole MBE ("MBE") for a violation of Title 18, United States Code, Section 1028(a)(3) (Possession With Intent to Use or Transfer Five or More Documents or Authentication Features).

2.   This affidavit is also made in support of an application for a warrant to search three digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service in Los Angeles, California, as described more fully in Attachment A:

   a.   A black Alcatel One Touch cellular phone with IMEI number 014470000817964 ("SUBJECT DEVICE 1");

   b.   A black Samsung Galaxy J3 cellular phone, Model SM-J327T, with IMEI number 352001095196863 and serial number AA2JA19PS/2-B ("SUBJECT DEVICE 2"); and

   c.   A black Samsung Galaxy J3 Prime cellular phone, Model SM-J327T1, with IMEI number 359617084542990 and serial number AA2J707QS2-B ("SUBJECT DEVICE 3").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1028(a)(3) (Possession With Intent to Use or Transfer Five or More Documents or Authentication Features), 1029 (Access Device Fraud), 1344 (Bank

Fraud), 1028A (Aggravated Identity Theft), and 1708 (Mail Theft or Possession of Stolen Mail) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the United States Secret Service ("USSS") and have been so employed since July 2016.  I am currently assigned to the Los Angeles Field Office, where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.  To become a Special Agent, I received eight months of training in Beltsville, Maryland, and training at the Federal Law Enforcement Training Center Criminal Investigator Training Program in Brunswick, Georgia.  Since completing my training, I have participated in numerous criminal investigations as either the case agent or an investigating agent.  In particular, I have participated in various aspects of

2

criminal investigations, including: bank records analysis, telephone records analysis, electronic surveillance, physical surveillance, search warrants, and arrests. I have also interviewed defendants, confidential informants, and witnesses who had personal knowledge regarding the methods used to commit bank fraud. I have also been involved in investigations related to violations of federal bank fraud, wire fraud, and other financial crimes and have spoken to many law enforcement agents regarding their experience in investigating financial crimes.

6. I am currently assigned to Identity Theft and Economic Crimes ("ITEC") Task Force, which is responsible for the investigation of various types of theft and fraud, including the manufacturing of counterfeit and fraudulent identification documents, the investigation of financial crimes (such as access device crimes, credit card fraud, check fraud, and the use of schemes to conceal and launder the proceeds of such crimes). ITEC is composed of USSS Special Agents, members of the Postal Inspection Services, Homeland Security Investigations, Internal Revenue Service Criminal Investigation, and the United States Treasury Inspector General for Tax Administration.

### III. **SUMMARY OF PROBABLE CAUSE**

7. On or about June 22, 2018, Los Angeles Police Department ("LAPD") personnel responded to a call from European Sales and Export Inc. ("European Sales") regarding an individual, later identified as MBE, who had fraudulently obtained an auto loan for a 2009 BMW X5 using victim G.T.'s personal identifying information ("PII"). After being told that

MBE had returned the BMW X5 to European Sales for repairs, LAPD detectives returned to European Sales when MBE arrived to pick up the BMW X5.  MBE had arrived with a female, who identified herself as Michelle Shepard, in Shepard's Honda Accord.  After Shepard consented to LAPD's search of the Accord, and MBE consented to LAPD's search of a black canvas bag in the Accord that MBE and Shepard both identified as belonging to MBE, LAPD detectives found evidence of mail and identity theft in MBE's bag.  LAPD found, among other things, credit cards and driver's licenses in the names of people other than MBE, approximately 10 social security cards, and profiles containing the PII for approximately 48 individuals who were not MBE.  MBE also possessed in the bag tax documents in the names of individuals other than MBE that, based on my training and experience with mail theft cases, are often sent through and stolen from the United States mail.  In addition, law enforcement also found the three SUBJECT DEVICES were found in a satchel carried by MBE. Law enforcement verified that 8 of the 10 social security cards possessed by MBE contained true numbers and names belonging to real people.

## IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    Initial Investigation

9.    On or about June 12, 2018, LAPD Detective J. Martinez was contacted by T.B., the owner of European Sales, regarding a

2009 BMW X5 (VIN #5UXFE435X9L261463) that had been sold for $15,080.00.  T.B. had been notified by State Farm Bank, who financed the car, that the information provided on the sales contract for the buyer was fraudulent.  T.B. provided LAPD with the sales contract, finance documents and a photocopy of the identification provided by the buyer, which were all in the name of G.T.  Detective Martinez reviewed the documents submitted by the buyer for the car loan, which included a copy of a Florida driver's license and Social Security card, and – based on his prior training and experience in identity theft crimes – recognized the Florida driver's license bearing G.T.'s name as counterfeit.[1]

### B.   LAPD Locates and Arrests MBE

10.   On or about June 21, 2018, Detective Martinez received a phone call from European Sales that MBE had returned the 2009 BMW X5, demanding that the dealer repair the BMW X5 because it was not running properly.  By the time Detective Martinez and his partner Detective Tagliere responded to European Sales, however, MBE had already left the dealership.

11.   The next day, on or about June 22, 2018, European Sales called Detective Martinez to tell him that MBE had returned to pick up the 2009 BMW X5, accompanied by a black

---

[1] Detective Martinez was familiar with the template used for that counterfeit Florida license from a prior investigation, in which another individual had used a similar fraudulent Florida driver license in the name of J.S. to purchase a 2015 Mini Cooper Countryman.  Although Detective Martinez initially thought MBE might be the same individual as the suspect in that prior investigation, Detective Martinez later clarified that they are different individuals.

female in a new Honda Civic.  Detective Martinez and Detective
Tagliere responded to the dealership and spoke with MBE and the
female, telling them that LAPD was conducting an identity theft
investigation, and asking them for their names.  The female
identified herself as Michelle Shepard, which the detectives
were able to verify using her driver's license and departmental
databases, and discovered that Shepard had an outstanding
misdemeanor warrant for driving with a suspended license in
violation of California Vehicle Code Section 14601.1.  MBE,
however, falsely identified himself as G.T.  Detective Martinez,
who had reviewed images of G.T. on Facebook, replied that he
knew MBE was not G.T. and that he knew MBE had been using
multiple names.  MBE then admitted that he was, in fact, Anatole
MBE, and stated that Shepard had nothing to do with the "cars."

12.  Detective Martinez asked SHEPARD if she was the owner
of the Honda Accord, and she replied that she was, and provided
her consent to search the Accord.  Shepard stated that he could
search the entire car and that the only thing in the car that
belonged to MBE was a black canvas bag on the passenger seat,
and some plastic bags in the back seat.  MBE also confirmed that
the black canvas bag was his, stated that everything inside it
belonged to him and not to Shepard, and consented to a search of
the bag.

13.  While searching MBE's black canvas bag, Detective
Martinez found: (1) at least four California driver's licenses
belonging to individuals other than MBE; (2) six out-of-state
driver's licenses containing the names and other personal

identifying information ("PII") for individuals other than MBE but all bearing MBE's photo; (3) 10 social security cards (of which eight were confirmed to be valid, as further described below); (4) 10 credit or debit cards in names other than MBE; (5) the State Farm car loan application for the 2009 BMW X5; (6) a copy of the sales contract from European Sales; (7) tax documents in the name of an individual who was not MBE; and (8) copies of a notebook containing 48 different profiles of people other than MBE that included names, addresses, and social security numbers.  Based on my training and experience conducting mail theft investigations, I know that tax documents are often sent through the mail with distinctive envelopes and are often targeted by identity thieves for mail theft.

14.   The LAPD detectives placed MBE under arrest for identity theft and grand theft auto in violation of California Penal Code Sections 530.5(a) and 487(d)(1) and placed SHEPARD under arrest for her outstanding warrant.  The detectives also determined that MBE had two outstanding arrest warrants from the state of Georgia.  While conducting a search incident to arrest, Detective Martinez found SUBJECT DEVICES 1, 2, and 3 inside a satchel carried by MBE.

## C.   Victim G.T. Confirms that MBE was Not Authorized to Use His Name or Information and LAPD Learns of a Data Breach from a Veteran's Administration Database in Guam

15.   On June 26, 2018, Detective Martinez spoke with victim G.T., who told Detective Martinez he had never lived in California and was, at that time, a military contractor living

in Guam.  Detective Martinez asked G.T. if G.T. knew MBE and if
G.T. had ever given MBE permission to use G.T.'s personal
information to buy a car.  G.T. stated that he did not know MBE
and did not give MBE permission to have or use G.T.'s personal
information.

16.  Detective Martinez knew from an early 2018 identity
theft investigation that several people associated with the
Veteran's Affairs center in Guam had become victims of identity
theft.  Specifically, Detective Martinez knew from speaking to a
prior identity theft victim that, following an earthquake, all
personnel at the Veteran's Affairs center had been forced to
seek medical attention off-base and were asked to complete a new
set of medical records that contained their personal
information.  Many of those individuals were discovered to have
become victims of identity theft.  Through his investigation,
Detective Martinez learned that the possible location of breach
was the off-base medical center.

17.  Detective Martinez checked the names of the
individuals contained in the approximately 48 different profiles
MBE had in the notebook found in his black bag against the names
of individuals associated with the Guam Veteran's Affairs
center.  By comparing the names, Detective Martinez determined
that most of the profiles possessed by MBE were also on the list
of individuals associated with the Guam Veteran's Affairs center
who had sought off-base medical assistance following the
earthquake.  Detective Martinez also verified with G.T. that he

was stationed on a military base in Guam and had to visit a medical facility off base to seek medical care.

**D.    Eight of the Ten Social Security Cards found in MBE's Black Canvas Bag are Confirmed to Have the True Names and Numbers of Real People**

18.    Law enforcement requested confirmation as to whether the 10 Social Security cards found in MBE's black canvas bag were valid.  On or about August 8, 2018, Special Agent Shane Taylor from the Office of the Inspector General for the Social Security Administration ("SSA-OIG") verified that eight of the ten card contained the true name and true social security numbers for eight individuals.

**V.    TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT**

19.    Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.    People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.

Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

         c.   Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

         d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

         e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and

identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

### VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

20.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

21.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital

data in a single day or even over several weeks for a number of reasons, including the following:

a.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     The SUBJECT DEVICES contain multiple gigabytes of storage space.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

12

onto a hard drive, deleted, or viewed via the Internet.[2]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[2] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

      e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

       g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  As discussed herein, based on my training and experience and review of publicly available materials, I believe that the SUBJECT DEVICES are enabled with biometric unlock functionality.

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-

recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

b.    If a device is equipped with a fingerprint
scanner, a user may enable the ability to unlock the device
through his or her fingerprints.  For example, Apple Inc.
("Apple") offers a feature on some of its phones and laptops
called "Touch ID," which allows a user to register up to five
fingerprints that can unlock a device.  Once a fingerprint is
registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the
phone, and on a laptop is located on the right side of the
"Touch Bar" located directly above the keyboard.  Fingerprint-
recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.
Motorola, HTC, LG, and Samsung, among other companies, also
produce phones with fingerprint sensors to enable biometric
unlock by fingerprint.  The fingerprint sensors for these
companies have different names but operate similarly to Touch
ID.

c.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d.    While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris

using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

        23.  In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

        24.  I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that

biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

25. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

26. For these reasons, the warrant I am applying for would permit law enforcement personnel to: (1) compel the use of MBE's

thumb- and/or fingerprints on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICES in front of MBE's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

//

//

//

//

//

//

//

//

21

## VII.  <u>CONCLUSION</u>

28.  For all of the reasons described above, there is probable cause to believe that MBE has committed a violation of Title 18, United States Code, Section 1028(a)(3) (Possession With Intent to Use or Transfer Five or More Documents or Authentication Features).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
Alfredo Rossi, Special Agent
United States Secret Service

Subscribed to and sworn before me
this ____ day of August, 2018.

MICHAEL R WILNER
_____
THE HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on or about June 22, 2018, and currently maintained in the custody of the United States Postal Inspection Service in Los Angeles, California.

1.      A black Alcatel One Touch cellular phone with IMEI number 014470000817964 ("SUBJECT DEVICE 1");

2.      A black Samsung Galaxy J3 cellular phone, Model SM-J327T, with IMEI number 352001095196863 and serial number AA2JA19PS/2-B ("SUBJECT DEVICE 2"); and

3.      A black Samsung Galaxy J3 Prime cellular phone, Model SM-J327T1, with IMEI number 359617084542990 and serial number AA2J707QS2-B ("SUBJECT DEVICE 3").

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1028(a)(3) (Possession With Intent to Use or Transfer Five or More Documents or Authentication Features), 1029 (Access Device Fraud), 1344 (Bank Fraud), 1028A (Aggravated Identity Theft), and 1708 (Mail Theft or Possession of Stolen Mail) (collectively, the "Subject Offenses"), namely:

   a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than MBE, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

   b.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

   c.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

     d.   Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

     e.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

     f.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

     g.   Contents of any calendar or date book stored on any of the digital devices;

     h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

     i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

     j.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

     k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

l.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

m.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

n.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

a.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iv

as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.  evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

       vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.    records of or information about Internet Protocol addresses used by the device;

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

3.    In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether a SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

vi

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that a SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

k.   During the execution of this search warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of MBE onto the fingerprint sensor of the SUBJECT DEVICES (only when the device has such a sensor), and direct which specific finger and/or thumb shall be depressed; and (2) hold the device in front of the face of the MBE with his eyes open to activate the facial-, iris-, or

retina-recognition feature, in order to gain access to the
contents of the SUBJECT DEVICES.

4.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.